COMMONWEALTH *vs.* SILAS N. PHELPS.

Franklin. May 16, 1911. — June 21, 1911.

Present: MORTON, LORING, BRALEY, SHELDON, & RUGG, JJ.

*Officer. Arrest. Homicide. Evidence,* Of information furnishing ground for suspicion, Of existence of suspicion, Things in evidence. *Constitutional Law. Witness,* Cross-examination. *Practice, Criminal,* Exceptions, Conduct of trial, Interrogation of juror, Isolation of jury in capital case. *Pleading, Criminal,* Indictment. *Jury and Jurors. Words,* "Suspect," "May."

A peace officer, who upon statements made to him by others has reasonable grounds to suspect and does suspect that a felony has been committed and that a certain person was guilty of it, lawfully may arrest such person without a warrant, and if the person thus reasonably suspected kills the officer in resisting the arrest he is guilty of murder.

At the trial of an indictment for the murder of a deputy sheriff when he was attempting to arrest the defendant without a warrant, the Commonwealth may show that at about half past six or seven o'clock on the evening previous to the death of the deputy sheriff, who was killed by the defendant early the next morning, the witness telephoned to the deputy sheriff at a place ten miles away and told him that the defendant " had knifed " a certain superintendent who had discharged him, and asked the deputy sheriff " to come and look after him, take care of him," that at about eleven o'clock that same night the witness saw the deputy sheriff and told him that the defendant drew a knife and stabbed the superintendent and that he said after stabbing him, " I have got you," that the witness also told the deputy sheriff that he saw the doctor who attended the superintendent, and that the doctor told him that the wound was from three to three and one half inches deep by an inch and a half wide, that it " had affected the breathing some " but that the doctor " thought he would recover." *Held,* that the evidence was competent to show what facts had been communicated to the deputy sheriff on which he had acted in attempting to arrest the defendant without a warrant.

It now is settled that a peace officer, who has a right to arrest a certain person without a warrant because he suspects on reasonable grounds that such person has committed a felony, also has a right to break open doors for the purpose of making the arrest.

At the trial of an indictment for the murder of a deputy sheriff when he was attempting to arrest the defendant without a warrant, if it is shown that the

deputy sheriff was informed by a person, who had seen the events which he described, that a certain factory superintendent had discharged the defendant and that later the defendant, meeting the superintendent and the witness, had drawn a knife and had stabbed the superintendent, the witness illustrating the defendant's action by putting his hand in his pocket and drawing it out in such a way as to show that the knife was open in the defendant's pocket and that the "drawing and striking were practically one movement," that the witness further told the deputy sheriff that immediately after stabbing the superintendent the defendant said, "I have got you," which the jury were warranted in finding meant "I have killed you," and that the witness also told the deputy sheriff that he had seen the doctor who had said that "the wound was three to three and one half inches deep, by an inch and a half wide, that it had affected the breathing some but that he thought he would recover," this authorizes a finding that the deputy sheriff suspected on reasonable grounds that the defendant had stabbed the superintendent with intent to commit murder and thus had committed a felony, and that accordingly the defendant had killed the deputy sheriff in resisting a lawful arrest.

The right of a peace officer to arrest without a warrant a person whom he suspects on reasonable grounds of having committed a felony is not in conflict with the provisions of the Fourteenth Article of the Massachusetts Declaration of Rights or with those of the Fourth Amendment to the Constitution of the United States, which are in restraint of general warrants to make searches.

Where a peace officer has a right to make an arrest without a warrant, he has the right to summon others to assist him in making the arrest, subject to the qualification that he shall use reasonable judgment and no unnecessary violence or force; and what is reasonable depends upon the facts in each particular case.

At the trial of an indictment for the murder of a deputy sheriff, named H, when he was attempting to arrest the defendant without a warrant, where there was evidence warranting a finding that the defendant shot the deputy sheriff with express malice as properly defined by the presiding judge in his charge to the jury, the judge instructed the jury as follows : "If, without warning or notice to H to desist, the prisoner, in cool blood, with express malice in his heart, to gratify feelings of ill will, or hatred, or any feeling which the jury find was express malice, intentionally shot and killed H, you will be warranted in finding the defendant guilty of murder, even though H was acting without right and unlawfully in attempting to make the arrest without a warrant." *Held,* that the instruction was correct and properly was given to the jury.

At the trial of an indictment for the murder of a deputy sheriff when he was attempting to arrest the defendant without a warrant, where there was evidence that the deputy sheriff had been called by telephone from a place ten miles away to come and look after the defendant because he "had knifed" a certain superintendent who had discharged him, the Commonwealth was allowed to show that on his arrival at the place to which he had been called the deputy sheriff said "Si [the defendant] is at it again," the judge instructing the jury that this statement could not be used by them to draw any inferences of fact that any act had been done by the defendant, but only to show the state of mind of the deputy sheriff at the time, with a view to any light it might throw upon his action in connection with his proceedings in making the arrest. *Held,* that the evidence was admissible to prove that the deputy sheriff suspected that the defendant had committed a felony.

At the trial of an indictment for the murder of a deputy sheriff when he was at-

tempting to arrest the defendant without a warrant, where there was evidence that the deputy sheriff suspected on reasonable grounds that the defendant had stabbed a certain superintendent with intent to commit murder and had summoned a posse of six persons to assist him in arresting the defendant at his house, of which the front door finally was broken in, one of these assistants, in narrating as a witness what took place before the deputy sheriff and two of the posse broke in the front door, testified on his cross-examination that the deputy sheriff placed two men at the back door and said, " The rest of us will go to the front and break in the door," and that the witness considered himself one of " the rest " referred to and went to the front door. The counsel for the defendant then asked this question : " That was the only invitation you had ? " to which the witness answered, " He swore us in on the way up, you understand." The defendant asked to have this answer stricken out on the ground that it was non-responsive, and excepted to a ruling of the presiding judge allowing it to stand.· *Held,* that the question might have been understood to ask whether the remark of the deputy sheriff was not the only invitation or authority that the witness and the others had from the deputy sheriff to act with him in making the arrest, and that thus understood the answer of the witness was responsive to it.

At the trial of an indictment for the murder of a deputy sheriff when he was attempting to arrest the defendant without a warrant, where there was evidence that the deputy sheriff suspected on reasonable grounds that the defendant had stabbed a certain superintendent with intent to commit murder, the defendant excepted to a part of the charge of the presiding judge which was as follows : " Where a dangerous wound is inflicted, which proves to be a felony through the death of the person wounded, the peace officer is not required to wait until the fact is ascertained whether the assaulted person dies or not. But if, as a reasonable man, he has a suspicion and probable cause to believe that the wound is of such a nature that a felony is likely to result from it through the death of the person wounded, then a condition exists upon which the jury, if they believe the facts, would be justified in finding the officer had probable cause to believe a felony had been committed, because, if the man dies of the dangerous wound, the criminal act dates from [the] time the act was done, and the felony, if ever committed, is committed when the wound is inflicted." *Held,* that this is a correct statement of the law.

At the trial of an indictment for the murder of a deputy sheriff when he was attempting to arrest the defendant without a warrant, where there was evidence that the deputy sheriff suspected on reasonable grounds that the defendant had stabbed a certain superintendent with intent to commit murder, the defendant, in objection to a certain portion of the judge's charge, contended· that there was no evidence on which the jury could find that the deputy sheriff had been told that a dangerous wound had been inflicted. A witness testified that he informed the deputy sheriff of the stabbing and told him that the doctor had said to the witness that the wound was " three to three and one half inches deep, by an inch and a half wide, that it had affected the breathing some but that he thought he would recover." *Held,* that whether the statement was one that the wound was dangerous depended largely upon the emphasis put upon the different words used, and that, as emphasis might have been put by the witness on the word " but " and the word " thought " in referring to the expression of opinion by the doctor, this court could not say that the judge was wrong in allowing the jury to find that on the communication made to him the deputy

sheriff was warranted in suspecting that a wound had been inflicted which was likely to result in death.

At the trial of an indictment for the murder of a deputy sheriff when he was attempting to arrest the defendant without a warrant, there was evidence that the deputy sheriff suspected on reasonable grounds that the defendant had stabbed a certain superintendent with intent to commit murder. There also was evidence warranting a finding that the defendant in fact stabbed the superintendent with murderous intent. The Commonwealth until the evidence was concluded relied on each of these grounds as authorizing the deputy sheriff to arrest the defendant without a warrant. At the close of the evidence the defendant's counsel asked the presiding judge to rule that there was no evidence that a felony had been committed. The judge refused to make this ruling. Thereupon the case was argued and the jury was charged, on the assumption that there was such evidence. At the conclusion of the charge, there was a conference of counsel, and the presiding judge, " the district attorney consenting," charged the jury that there was no evidence that the defendant made an assault on the superintendent with intent to kill, and that the Commonwealth's case in regard to the deputy sheriff proceeding without a warrant then rested solely upon the testimony in regard to the deputy sheriff's suspicion that a felony had been committed, and said to the jury, " You may disregard all the evidence relative to the assault by the defendant upon [the superintendent] except so far as it appears in evidence that the facts in relation thereto were communicated to " [the deputy sheriff]. During the trial and before the district attorney had elected not to press his contention that a felony had been committed, the judge had refused a request of the defendant to order all the evidence in regard to the assault by the defendant on the superintendent stricken from the record except so far as it appeared that the facts had been communicated to the deputy sheriff, and the defendant had excepted to the refusal. *Held*, that the exception must be overruled, because the ruling was right at the time it was made, the evidence having warranted a finding that the defendant had made the assault on the superintendent with intent to commit murder.

Upon an indictment for the murder of a deputy sheriff when he lawfully was attempting to arrest the defendant, it is not necessary in order to prove this crime for the indictment to allege that the person killed by the defendant was a deputy sheriff, because the crime charged is murder, and one way of proving that the killing amounted to murder is to show that the deceased was a deputy sheriff who was killed by the defendant when lawfully proceeding to arrest him.

At the trial of a criminal case, as of a civil one, no exception lies to an alleged statement by the presiding judge in the course of a colloquy with counsel during the trial, which is merely an explanation by him to the objecting counsel of his reason for admitting a question.

At a criminal trial, as at a civil one, the determination whether questions shall be put by the presiding judge to a juror in addition to those prescribed by R. L. c. 176, § 28, is wholly within the discretion of the judge.

In this Commonwealth the defendant in a capital case has not a right to have the jurors who already have been sworn and impanelled kept together during a recess taken by the court before the impanelling of the jury is completed.

At the trial of an indictment for the murder of a deputy sheriff when he was attempting to arrest the defendant without a warrant, there was evidence that the deputy sheriff suspected on reasonable grounds that the defendant had stabbed a certain factory superintendent with intent to commit murder. There also was

evidence that the defendant in fact stabbed the superintendent with murderous intent, but after the close of the evidence and of the arguments the district attorney, for the purpose of showing the right of the deputy sheriff to arrest the defendant, elected to rely only on the suspicion of the officer on reasonable grounds that the defendant had committed a felony, and consented to an instruction by the judge that there was no evidence that the defendant made an assault on the superintendent with intent to kill. During the trial, and before the district attorney had changed his position, the knife with which the defendant had stabbed the superintendent was admitted in evidence and was marked as an exhibit. The defendant excepted to its admission. When the other exhibits were sent to the jury room the knife was sent with them, and the defendant at that time made no objection. The jury found the defendant guilty of murder, and the defendant argued his exception to the admission of the knife in evidence, objecting to its having gone to the jury as an exhibit when it no longer was material. *Held,* that the knife properly was admitted in evidence, being material evidence at the time it was admitted, and that the defendant, not having made any objection when it was sent to the jury room, could not complain thereof.

LORING, J. The exceptions in this case were taken during a trial which resulted in the defendant being convicted of murder in the first degree.

The circumstances were as follows. Previous to June 11, 1910, the defendant had been employed by the Ramage Paper Company at Monroe Bridge. On coming to work on that day, between five and six o'clock in the afternoon, he found some one else in his place. Thereupon he went into the office of the company and found there one Sibley and one McIntyre. Penman, the superintendent of the Paper Company, soon after came into the office. Penman's story was that he told the defendant that if he could not do better he had better get out and stay out. That the defendant said that no one could put him out. Whereupon he (Penman) told McIntyre to put him out and McIntyre did so peacefully and without trouble. That he (Penman) followed the defendant as he went out and the defendant, when outside the door, turned and said to him (Penman), " I will have your heart's blood before morning " ; that about ten minutes after six o'clock Penman and McIntyre met the defendant on the highway and he (Penman) told the defendant that he had better " take a tumble to himself and straighten up," whereupon the defendant, who up to that time had had his hands in his pockets without saying anything, stabbed Penman with a knife " under the left shoulder." McIntyre's account did not differ in substance, but he added that the knife was open when the de-

fendant took it from his pocket, and " drawing and striking were practically one movement." McIntyre also testified that just after the stabbing the defendant said. " I have got you."

The doctor who attended Penman testified that he found a clean cut about an inch and a quarter in length and something like three to three and a half inches deep, on the left side, about the seventh rib, in the axillary line, " in the juxtaposition of the heart, being six inches from the left nipple." There was also evidence that on the afternoon of the day that Penman was stabbed the defendant had said that " ' he was going down that night, and if Penman didn't set him to work he would fix that son of a bitch,' meaning Penman."

McIntyre further testified that at about half past six or seven he telephoned to Haskins, the deceased, who was a deputy sheriff at Charlemont, and told him that the defendant " had knifed Penman, and asked him to come and look after him, take care of him " ; Charlemont was some ten miles distant, and McIntyre saw Haskins at Monroe Bridge at about eleven o'clock that same night. McIntyre then testified in these words : " I told him that Si came into the office, and Mr. Penman had fired him, discharged him, and on going up the hill, we met him again, and that Penman had asked him, putting up his hand, what he meant by this business, and that Si drew a knife and stabbed him, (and illustrated by putting his hand in his pocket and the striking.) . . . I told him that he said, ' I have got you,' after stabbing. I told him also of seeing the doctor who attended Penman, and that the doctor had told me that the wound was three to three and one half inches deep, by an inch and a half wide, that it had affected the breathing some but that he thought he would recover."

The circumstances of the killing told by a number of witnesses produced by the government was in substance as follows : Haskins met McIntyre and four other men in a barn at about twenty minutes after eleven at night, and arranged to go to the defendant's house with those then present and two more, and arrest him at daybreak. One of the four seems to have backed out, and at about half past three o'clock in the morning Haskins, McIntyre and five other men started for the defendant's house. They arrived there about four o'clock. The sun was due to

rise on June 12 at seven minutes after four. When they arrived at the house Haskins rapped on the door and said in a loud voice: " I am Sheriff Haskins, come to arrest Silas Phelps for the knifing of Mr. Penman." That "He had better come quietly, and make no trouble; that would be best for all concerned." No answer being given Haskins rapped again, and again called out, stating who he was and calling upon the defendant to give himself up. There still being no answer Haskins rapped again, and again stated who he was and again called upon the defendant to give himself up. He then called on the defendant's wife to open the door and she said that she would not do so. Haskins asked if she realized that she was hindering an officer in the performance of his duty. To this she gave no answer. Again Haskins rapped and asked the defendant's wife to open the door, and she said that she would not do so. Haskins then asked if the defendant was at home and she said that he was not. After posting two men at the back of the house Haskins, McIntyre and one Tower broke in the front door and went into the kitchen, and as they did so steps were heard ascending the stairs, whereupon Haskins went to the foot of the stairs " and moved his body forward into the opening of the door of the stairway," and said, " Come, Si, I see you. Come on down now," and that he was then shot down by the defendant, who stood at the top of the stairs, and died in a few seconds. Haskins was shot at the top of the breast bone in the centre line. The defendant soon after appeared at a window of the house and told the posse to leave or he would begin shooting again. They left. The defendant took to the woods and was captured on June 15, three days later.

There was also evidence that the defendant had said that Haskins " swore a false oath against " him a year before, in the " Shippee case," and " that he would shoot him [Haskins] if he ever came to arrest him again." That Haskins "swore to a damn lie when he had me to Greenfield, and he never will swear to another one, nor he never will arrest me. He will die or I shall." " I don't know whether he told him, but that is what he told me, and he told others the same thing, too, what he told me. ' Emmett, by God! you will never arrest me again. Either you will be a dead man or I will.' Emmett says, ' may be you and

may be me.' He (meaning the defendant) says to Emmett, 'By God! Emmett, you never will arrest me again.' . . . Emmett says, 'it may be you and may be me,' and he (meaning the defendant) said, 'I know damned well it will be you.'" That if Haskins ever came to arrest him again "he won't take me alive."

These or similar statements had been repeated by the defendant a number of times. Further, on the night of the day Penman was stabbed the defendant said that "he was going down that night, and if Penman didn't set him to work he would fix that son of a bitch," and that on the next morning he telephoned to a cousin, who was a selectman of Monroe Bridge, "There is a corpse here for you. They came up here and smashed right in and I just stopped them. . . . I shot him. . . . I shot to kill."

There was a conflict in the evidence which it is not necessary to speak of in detail. It is enough to say that the defendant testified that Penman began the quarrel and he stabbed him in self defense; that on the morning of June 12 he did not recognize Haskins's voice, and that the shot gun that killed him was discharged by accident.

The Commonwealth put its case on three grounds, namely: (1) That in stabbing Penman the defendant committed a felony and therefore Haskins had a right to arrest the defendant without a warrant; (2) that on facts communicated to him by McIntyre Haskins had reasonable ground to believe and did suspect that a felony had been committed; and (3) that the defendant shot Haskins with express malice out of hatred and for revenge. Whether a felony had or had not been committed in this case depended upon whether the defendant stabbed Penman with intent to commit murder, for that is punishable by imprisonment in the State prison (R. L. c. 207, § 15) and so is a felony. R. L. c. 215, § 1.

At the conclusion of the evidence the defendant's counsel asked the presiding judge * to rule that there was no evidence that a felony had been committed. This was refused. Thereupon the case was argued and the jury were instructed on that

* *Schofield*, J.

footing.    After a conference with counsel on the conclusion of the charge the presiding judge, "the district attorney consenting," charged the jury "that there was no evidence that Phelps made an assault upon Penman with intent to kill."    The judge went on and instructed the jury that the Commonwealth's case in regard to Haskins's proceeding without a warrant "now rests" solely upon the testimony in regard to Haskins's suspicion that a felony had been committed, and told them: "You may disregard all the evidence relative to the assault by the defendant upon Penman, except so far as it appears in evidence that facts in relation thereto were communicated to Haskins."

Before taking up the several exceptions taken by the defendant, we will deal with a question which is a fundamental one in this case, namely, the right of an officer to arrest on suspicion of felony.    It was laid down by Chief Justice Shaw in *Commonwealth* v. *Carey*, 12 Cush. 246, 251, that "if a constable or other peace-officer arrest a person without a warrant, he is not bound to show in his justification a felony actually committed, to render the arrest lawful; but if he suspects one on his own knowledge of facts, or on facts communicated to him by others, and thereupon he has reasonable ground to believe that the accused has been guilty of felony, the arrest is not unlawful."    If it was intended by this statement in *Commonwealth* v. *Carey* to make a distinction between the fact of suspicion where the officer had reasonable ground to believe, and the fact of suspicion where he had reasonable grounds to suspect that a felony had been committed, the defendant in the case at bar had the benefit of the difference.    But it was pointed out in *Jackson* v. *Knowlton*, 173 Mass. 94, 97, that the word "suspect" is ordinarily used in place of "believe" in stating what the officer must have reasonable grounds of.    If, as is undoubted law, it is enough that the officer suspect that a felony has been committed, it must be enough that he had reasonable grounds to suspect.    And (as stated in *Jackson* v. *Knowlton*) the authorities are to that effect.    See *Rohan* v. *Sawin*, 5 Cush. 281, 285; 5 Bac. Abr. 588; *Beckwith* v. *Philby*, 6 B. & C. 635; *Davis* v. *Russell*, 5 Bing. 354.    The cases are collected in 2 Am. & Eng. Encyc. of Law, (2d ed.) 870.    We shall hereafter speak of the rule accordingly.

We will take up the several exceptions in the order of the defendant's brief.

1. The first thing complained of by the defendant is that when the district attorney elected to withdraw his contention that a felony had been committed the judge told the jury: "You may disregard all the evidence relative to the assault by the defendant upon Penman, except so far as it appears in evidence that facts in relation thereto were communicated to Haskins." The defendant's contention is that the judge should have told the jury that "they must," not that "they may" disregard that evidence. In our opinion there was evidence which warranted a finding that the defendant stabbed Penman with intent to commit murder. This statement of the presiding judge was not made to cure an error previously made (as was the case in *Farnum* v. *Farnum,* 13 Gray, 508, and *Commonwealth* v. *Edgerly*, 10 Allen, 184, relied on by the defendant), but to give the necessary instructions consequent on the change which had taken place in the government's case. The judge's attention was not called to the use of the word "may" in place of "must" in this part of the charge. The one exception taken to it was as to the use of the word "suspicion" in place of "belief" that a felony had been committed. But apart from that it is plain on reading the whole of this additional instruction that the word "may" was used as a word of command and not as a word of permission, and that this could not have been misunderstood by the jury.

2. The next exceptions are those taken to the communications over the telephone made by McIntyre to Haskins when he (Haskins) was at Charlemont on the afternoon of June 11; and those made by him to Haskins in the evening of the same day, after Haskins had come to Monroe Bridge. This evidence was competent to show that facts had been communicated to Haskins on which he acted in attempting to arrest the defendant without a warrant.

3. The first, third and fifth rulings asked for * could not have

---

* The rulings thus requested were as follows:

"1. That, as a matter of law, upon all the evidence, the defendant cannot be convicted of murder; that upon all the evidence, the only question for the jury is whether the defendant is guilty of manslaughter."

been given because the evidence warranted a finding that Haskins' had reasonable ground to suspect and did suspect that the defendant had stabbed Penman with intent to murder. The first ruling asked for could not have been given for the additional reason that the evidence warranted a finding that the defendant killed Haskins with express malice, out of hatred and revenge. The sixth ruling asked for,* if given, would have been likely to mislead.

There was evidence warranting a finding of express malice in the killing of Haskins, and the ruling requested did not cover the whole subject. The instruction given was full and accurate.†

---

" 3. The deceased, not having a warrant for the arrest of the defendant, was unlawfully upon the defendant's premises."

" 5. If the deceased was attempting to arrest the defendant for a past offense, not felony, without a warrant, and if the defendant in resisting such arrest, killed the deceased, he cannot be convicted of murder."

* " 6. If the defendant was resisting an unlawful arrest and took the life of Emmett F. Haskins, the party attempting to arrest him, he is not guilty of murder."

† " The killing by reason of provocation, in the attempt unlawfully to arrest, would be deemed by the law to be killing without malice aforethought. That is the rule where no other facts appear except the fact of an attempt to arrest without authority of the law, where the person making the arrest is proceeding in an orderly and proper manner, for the purpose of making the arrest, where he is resisted. In the case where the person attempting to make the arrest uses unnecessary violence, an unreasonable degree of force, that action on the part of the person attempting to make the arrest justifies on the part of the person who is sought to be arrested a right to use force to meet the unnecessary violence. But the simple rule in the case that I have stated, where a peace officer is attempting, without a warrant, and unlawfully, to arrest a person, proceeding in an orderly manner to affect [effect] the arrest, is resisted, and in the course of the resistance the person sought to be arrested kills the officer, although it is an unlawful act, no other facts appearing than those I have stated to you, the law says that it is not homicide with malice aforethought, which is necessary to constitute murder, but will, in contemplation of law, be manslaughter. Of course, in any case, other facts might appear which would show that the defendant had a right to resist on ground of self defense or otherwise, and if acting within the right of self defense, he proceeded to the extremity of killing, on the ground of self defense, then there would be no criminal liability whatever. But in an unlawful arrest, where the officer or person seeking to make the arrest proceeds in the usual ordinary manner, for the purpose of taking the person sought to be arrested into custody, that is not a kind of

4. An officer who has the right to arrest without a warrant because he suspects on reasonable grounds that the defendant

---

violence, if nothing more appears, which justifies the taking of life to prevent it. Doing so is an unlawful act, nothing more appearing, but the law deems the attempt to arrest by one having no authority a provocation which, in concession to the frailty of human nature, leads to a mitigation of the offense and to the treatment of it, not as a homicide with malice aforethought, but the lesser crime, namely manslaughter.

" In this case there is testimony from several witnesses that the defendant, the prisoner at the bar, upon several occasions, spoke of the deputy sheriff and used expressions in regard to him and in regard to what would happen if the deputy sheriff should attempt to arrest him again, from which the Commonwealth asks the jury to believe that this defendant, the prisoner at the bar, had towards the deputy sheriff express malice; that he had in his mind feelings of ill will or hostility toward the deputy sheriff. It is a question of fact, gentlemen, for you to decide upon the evidence in the case whether such is the truth. The instructions that I have just given in regard to the criminal responsibility of the defendant, if the deputy sheriff was killed by him in the course of affecting [effecting] an unlawful arrest, was on the assumption that no express malice was proved. I shall now instruct you upon the assumption that you do in fact find that there was express malice in the mind of this defendant, the prisoner at the bar, toward the deputy sheriff, Emmett F. Haskins.

" Express malice means an actual state of mind existing in the heart of the defendant towards the deputy sheriff of ill will, or hatred, or dislike, or kindred feelings. Where express malice is shown to exist on the part of the person sought to be arrested, against the person who attempted to arrest him, and where he kills the person, where he intentionally kills the person who sought to arrest him, through express malice, a different rule of criminal responsibility applies from that which exists where the killing in resistance of an unlawful arrest was without any proof or evidence of express malice. In this case, assuming now that the deputy sheriff was acting without authority of law in attempting to arrest Phelps, if Phelps knew Haskins was the man at the foot of the stairs, and also knew that Haskins intended to do no bodily harm to him or to any member of his family, or any injury to his habitation, but only to arrest and take him into custody, and if he had no apprehension or reasonable ground for apprehension of any such bodily harm or danger of harm from Haskins or those with Haskins, and if without warning or notice to Haskins to desist, the prisoner, in cool blood, with express malice in his heart, to gratify feelings of ill will, or hatred, or any feeling which the jury find was express malice, intentionally shot and killed Haskins, you will be warranted in finding the defendant guilty of murder, even though Haskins was acting without right and unlawfully in attempting to make the arrest without a warrant. If you find further, by the degree of proof which I have referred to and shall later refer to again, if he intentionally shot, if the intentional shooting was

has committed a felony, has a right to break open doors. That may be taken to be settled now. 4 Bl. Com. 292. 1 Hale P. C. 588. 2 Hale P. C. 94. *Semayne's case*, 5 Co. 91 a, although, as is pointed out in 1 Hale P. C. 588, there was formerly authority to the contrary. See also Foster's Crown Law, 321; 2 Hawk. P. C. c. 14, § 7.

The defendant relies on the fact that Bigelow, J., in *McLennon* v. *Richardson*, 15 Gray, 74, 77, in enumerating the cases where a constable has authority " to break open doors and arrest without a warrant," did not include the case. where there is a suspicion of felony as well as a felony. That cannot be taken (in connection with the question there under discussion) to mean that an officer who has a right to arrest without a warrant does not have a right to break open doors. The two were treated as standing on the same footing, and in the enumeration the right to arrest on suspicion of felony (that not being there in question) was omitted. The ninth, twelfth and seventeenth requests * were rightly refused.

---

deliberately premeditated in the sense I have explained deliberate premeditation, you will be justified in finding the defendant guilty of murder in the first degree, even though Haskins was acting without right and unlawfully in attempting to make the arrest without a warrant."

* The rulings thus requested were as follows:

" 9. There being no evidence that Haskins had a warrant for the arrest of this defendant, and if no felony had been committed, Haskins had no business to enter the defendant's house in the night time for any purpose, and if he did so enter, and was killed by the defendant, in defense of his person, his family or his property, it was a justifiable or excusable homicide and the defendant cannot be convicted of murder or any other offense."

" 12. There being no evidence that Haskins had a warrant for the arrest of the defendant; that the defendant was a fugitive from justice, and in the act of fleeing, but was in his own house, with his family, Haskins had no right to surround said house with an armed posse, and had no right to forcibly enter said house for any purpose, and if he did so enter and was killed by the defendant, either through fear of personal bodily harm, for his life, or the lives of his family, the defendant was not obliged to retreat, but could use such force in repelling the assault as was necessary, even to the extent of taking the life, or lives of the persons so entering, and the act of said taking of said life would be excusable or justifiable homicide, and the defendant would not be guilty of any offense."

" 17. That said Haskins had no legal right, without having a warrant in his possession, properly issued for the arrest of the defendant, Silas N. Phelps,

5. The eleventh request * was rightly refused even if there had been no reasonable ground to suspect that a felony had been committed. But the request assumes that there was not such evidence, and that question is also raised by the fourth and eighth requests † for rulings. We are of opinion that there was such evidence. What Haskins was told by McIntyre was that Penman had discharged the defendant and later the defendant, on meeting Penman and McIntyre, had drawn a knife and stabbed him, "and [McIntyre] illustrated by putting his hand in his pocket and the striking." This illustration must be taken to have meant that the knife was open in the defendant's pocket and that the " drawing and striking were practically one movement," as McIntyre testified was the fact. Haskins was further told by McIntyre that immediately after stabbing Penman the defendant said " I have got you," which the jury were warranted in finding meant " I have killed you " ; and also that he (McIntyre) had seen the doctor who said " the wound was three to three and one half inches deep, by an inch and a half wide, that it had affected the breathing some but that he thought he would recover." This authorized a finding that Haskins suspected on reasonable grounds that the defendant

---

to break and enter, in the night time, into the dwelling house of the defendant, then occupied by the defendant and his family, and if, without such warrant, the said Haskins did, in the night time, break and enter said dwelling house, and the defendant thereupon shot and killed him, in said dwelling house, the defendant is not guilty of murder in so doing."

* The ruling thus requested was as follows :

" 11. There being no evidence that Haskins had a warrant for the arrest of this defendant, and Haskins having no reasonable ground to suspect that a felony had been committed, Haskins had no business to enter the defendant's house in the night time, for any purpose, and if he did so enter and was killed by the defendant, in defense of his person, his family or his property, it was justifiable or excusable homicide and the defendant cannot be convicted of murder or any other offense."

† The rulings thus requested were as follows :

" 4. On all the evidence, the deceased had no reasonable ground to believe that the defendant was guilty of felony, and the attempted arrest of the defendant in his house without such reasonable ground was an unlawful act on the part of the deceased and the defendant cannot be convicted of murder."

" 8. In order to justify the act of the deceased, the burden is upon the Commonwealth to prove beyond a reasonable doubt that a felony had been committed, and that the officer had reasonable cause to believe that the defendant was the person who committed such felony."

had stabbed Penman with intent to commit murder and so that a felony had been committed. It is to be noted that it is not necessary that the communication which induces the officer to suspect that a felony had been committed should in terms state that a felony has been committed or facts which of necessity mean that. It is enough that the communication "in its popular sense would import such charge." *Commonwealth* v. *Carey*, 12 Cush. 246, 251, 252.

The further objection made by the defendant that an arrest without a warrant is in conflict with the Fourteenth Article of the Declaration of Rights of the Constitution of the Commonwealth was disposed of in *Rohan* v. *Sawin*, 5 Cush. 281. It was there stated that those provisions were in restraint of general warrants to make searches and that they do not conflict with the authority of officers or private persons under proper limitations to arrest without a warrant when authorized by the common law or by statute. To the same effect see *Wakely* v. *Hart*, 6 Binn. 316. The same is true of the Fourth Amendment to the Constitution of the United States.

6. The defendant took an exception to what was said in the charge as to the right of Haskins " to take all measures that are reasonably necessary to affect [effect] the arrest," if he had a right to arrest without a warrant. The presiding judge said in that connection: " He [the officer] has a right to summon others to assist him in making the arrest, subject always to the qualification that he shall use reasonable judgment and no unnecessary violence or force. What would be reasonable on the part of a peace officer in proceeding to make an arrest depends upon the facts in each particular case. It is the duty of the jury to consider all of the circumstances shown by the evidence in this case in passing judgment upon the question whether the peace officer used reasonable judgment in executing the authority which the Commonwealth contends was conferred upon him by law to make the arrest." There was evidence that of the six men who accompanied Haskins one had a rifle, one a shot gun, two each had a revolver and in addition Haskins had a revolver which remained in its holster until it was taken from it after his death. We see no error in this part of the charge.

7. The presiding judge instructed the jury that " If without

warning or notice to Haskins to desist, the prisoner, in cool blood, with express malice in his heart, to gratify feelings of ill will, or hatred, or any feeling which the jury find was express malice, intentionally shot and killed Haskins, you will be warranted in finding the defendant guilty of murder, even though Haskins was acting without right and unlawfully in attempting to make the arrest without a warrant." To this the defendant took an exception. The whole of the charge on express malice has been stated above in full. We are of opinion that this exception also must be overruled. The only argument in support of it not already disposed of is that there was no evidence that the defendant killed Haskins for any other reason or purpose than by accident or to avoid arrest. It is enough to say without repeating the evidence already stated that there was evidence that warranted a finding that the defendant shot Haskins with express malice as defined in the charge. For similar cases see *Rafferty* v. *People*, 72 Ill. 37. *Muscoe* v. *Commonwealth*, 86 Va. 443. *State* v. *Holcomb*, 86 Mo. 371.

8. Under the defendant's objection and exception the judge allowed the Commonwealth to prove that on his arrival at Monroe Bridge Haskins said, "Si is at it again." This was admissible to prove that Haskins did suspect that the defendant had committed a crime. The judge in his charge instructed the jury that it could not be used by them to draw any inferences of fact that any act had been done by the defendant but only to show the state of mind of Haskins at the time, with a view to any light it might throw upon his action in connection with his proceedings in making the arrest. This exception must be overruled.

9. In narrating what took place before Haskins and two of the posse broke in the front door, McIntyre testified on cross-examination that Haskins placed two men at the back door and said, "The rest of us will go to the front, and break in the door." That he (McIntyre) considered himself one of the "rest of us" and went to the front door. The counsel for the defendant then asked this question: "That was the only invitation you had," to which McIntyre answered, "He swore us in on the way up, you understand." The defendant asked to have the answer stricken out as not responsive, and excepted to the

ruling that it should stand, on the same ground. We are of opinion that the counsel's question might have been understood to mean that this remark was the only invitation or authority which McIntyre and others had from Haskins to act with him in making the arrest, and so was responsive to the question. This exception must be overruled.

10. The defendant excepted to the statements as to "suspicion" made in the further charge to the jury after the district attorney had consented to waive his claim that a felony had been committed. This has already been dealt with.

11. The defendant excepted to that part of the charge in which the judge instructed the jury that: "Where a dangerous wound is inflicted, which proves to be a felony through the death of the person wounded, the peace officer is not required to wait until the fact is ascertained whether the assaulted person dies or not. But if, as a reasonable man, he has a suspicion and probable cause to believe that the wound is of such a nature that a felony is likely to result from it through the death of the person wounded, then a condition exists upon which the jury, if they believe the facts, would be justified in finding the officer had probable cause to believe a felony had been committed, because, if the man dies of the dangerous wound, the criminal act dates from [the] time the act was done, and the felony, if ever committed, is committed when the wound is inflicted." The defendant's first contention is that this is not correct as matter of law. It is supported by the authority of Sir Matthew Hale, who says in 2 Hale's Pleas of the Crown, 94: "If A. hath wounded B. so that he is in danger of death, and A. flies and takes his house and shuts the doors, and will not open them, the constable of the vill where it is done, or upon hue and cry, may break the doors of the house to take him, if upon demand he will not yield himself to the constable. 7 E. 3, 16. b. Barre, 291." We are of opinion that as matter of law it is correct. The defendant's second contention is that there was no evidence on which the jury could find that Haskins had been told that a dangerous wound had been inflicted. He had been told that the doctor had told McIntyre that the wound was "three to three and a half inches deep by an inch and a half wide, that it had affected the breathing some but that he

thought he would recover." Whether that was a statement that the wound was a dangerous one depends largely on the emphasis put upon the different words used. The statement was not that he would recover, but that the doctor "thought" he would recover. Again, the statement was not "and" the doctor thought he would recover. The statement was "but" the doctor thought he would recover, which well might be taken to mean "but in spite of that the doctor thought he would recover." If emphasis is put upon these two words we cannot say that the judge was wrong in allowing the jury to find that on the communication made to him Haskins was warranted in suspecting that a wound had been inflicted which was likely to result in death. This exception must be overruled.

12. By his second request the defendant asked " That the court order all the evidence relative to the assault by Phelps upon Penman stricken from the record, except so far as it appears in evidence that the facts in relation thereto were communicated to Haskins." This request was made and the exception taken to the refusal to give it was taken before the district attorney elected not to press his contention that there was evidence that a felony had been committed. When the request was made and the exception taken, the ruling asked for was rightly refused because the evidence warranted a finding that the assault upon Penman was an assault with intent to commit murder. The request was not renewed after that change in position on the part of the district attorney. The rights of the defendant upon that change being made were fully secured to the defendant by the judge's direction to the jury to disregard all evidence relative to the assault except so far as they appear to have been communicated to Haskins, which has been already dealt with, *supra.*

13. The fifth request for a ruling * could not have been given because there was evidence that the defendant suspected on reasonable grounds that a felony had been committed, and because there was evidence that in shooting Haskins the defendant acted with express malice.

14. The next exception is to the admission in evidence of the

---

* Quoted *ante* at foot of page 406.

fact that Haskins was a deputy sheriff. The ground of this exception is that that fact is not alleged in the indictment. But the crime for which the defendant was indicted was murder. One way of proving that the killing amounted to murder was that Haskins was killed by the defendant while resisting arrest by Haskins, who was lawfully endeavoring to arrest him. That is matter of evidence, not of allegation. It is none the less matter of evidence and not of allegation in an indictment for the killing, because if Haskins had not been killed and Phelps had sued him in a civil suit he would have had to plead those facts as his justification. *Brown* v. *State*, 33 Vroom, 666. *Keady* v. *People*, 32 Col. 57. *Wright* v. *State*, 18 Ga. 383. *Dilger* v. *Commonwealth*, 88 Ky. 550.

15. The defendant excepted to a statement made by the judge under the following circumstances: "Witness was asked a question, and in the course of a discussion as to its admissibility, between the court, district attorney and Mr. Davenport, the court made the following statement: . . . I assume the connection is being evidence that he was called by telephone call, evidence that very soon after receiving the call, he went, and the argument to the jury is that he went in obedience to the call, and went as a deputy sheriff, in the execution of his office." On the defendant's excepting to that statement the judge added "I do not make that as a statement, but that is the purpose. I said that is what suggested itself to me when the evidence was offered along that line." All that the judge did was to explain to counsel his reason for admitting the question and this was made plain by the explanation given by him on the defendant's taking his exception.

16. The defendant's exception to the refusal of the judge to interrogate each juror as to his having read an article then before the court in the Greenfield Recorder is not well taken. Whether any questions shall be put to the persons called as jurors in addition to those prescribed by R. L. c. 176, § 28, is a matter lying within the discretion of the presiding judge. *Commonwealth* v. *Gee*, 6 Cush. 174. *Commonwealth* v. *Poisson*, 157 Mass. 510. *Commonwealth* v. *Thompson*, 159 Mass. 56. *Commonwealth* v. *Warner*, 173 Mass. 541. The defendant's motion was limited to a request that the jurors be interrogated on

this subject. There was no offer to introduce evidence *aliunde* that these persons did not stand indifferent. We find nothing in the cases cited by him which helps the defendant.

17. We know of no case in this Commonwealth or elsewhere in which it is held that the defendant in a capital case has a right to have the jurors who have been sworn and impanelled kept together during a recess taken by the court before the impanelling of the jury is completed.* For cases to the contrary see *Tooel* v. *Commonwealth*, 11 Leigh, (Va.) 714; *Epes' case*, 5 Gratt. 676; *State* v. *Burns*, 33 Mo. 483.

18. At the argument the defendant complained that the knife with which the defendant stabbed Penman was sent out with other exhibits to the jury room. It was properly admitted in evidence and marked as an exhibit before the district attorney changed his position. The only exception taken by the defendant was that then taken. This exception must be overruled. The defendant cannot complain now that since the district attorney had changed his position the knife should not have been sent into the jury room. The defendant made no objection to that at the time and cannot now complain of it.

We have discussed all exceptions argued by the defendant. In addition we have considered all taken by him but not argued, and we have found no error in any of the rulings to which they were taken.

The entry must be

*Exceptions overruled.*

*W. A. Davenport*, (*H. E. Ward* with him,) for the defendant.

*R. W. Irwin*, District Attorney, (*C. N. Stoddard* with him,) for the Commonwealth.

---

* During the impanelling of the jury, the court took a noon recess, and the defendant's counsel requested the judge that the jurors already sworn and impanelled might be kept together during the noon recess, under the care of the officers. The judge refused so to rule, and permitted the jurors to separate and to return into court at two o'clock. To this ruling the defendant excepted.